Please call the first case. The second case. Attorney for the appellant. Good morning, Your Honor. Steve Mandel on behalf of the W. F. L. D. Defendants and my co council. Leah Bruno on behalf of the B. G. A. Defendants, which are Andy Shaw and the Better Government Association. May it please the court. John Fotopoulos on behalf of Jim Ryan, plaintiff appellee. Are you both going to be arguing? Yes, Your Honor. I thought that I would begin the argument and then reserve some time for divide your time appropriately. As I said, it's 15 minutes for each side. We have time. I'm not going to really watch the minutes that closely at the same time. Don't push it. Okay. Do you want me to specify how much time I would take? No, you need not specify. Just proceed. Thank you. Mr. Mandel. Thank you, Your Honors. In 2010, a government watchdog group aptly called the Better Government Association and W. F. L. D., a local media outlet, got together and petitioned their government to address what they perceived to be inefficiencies in the current system. This is classic petitioning speech. It lies at the heart of the First Amendment. It's speech that the Illinois Anti-Slap Statute, the CPA, was designed to foster and protect. No other Illinois decision applying the CPA has involved such a direct appeal to government and request for reform. Now, we have given you a lot of briefing on how to apply the CPA, but perhaps the most simple roadmap to look at is Mr. Justice Quinn's opinion in the Hammonds case, which, of course, came down earlier this year after the Illinois Supreme Court's decision in Sandholm. And in Hammonds, this Court laid out a three-pronged test for determining when the CPA applies. Namely, the CPA provides for dismissal when, one, you have the exercise by the defendants of First Amendment rights directed towards bringing about favorable government change. We think without question that is met here. You have the defendants speaking out about inefficiencies in government, calling for reform, and actually achieving results in getting reform. And as we'll see a little bit later, it's this kind of speech, I think, that distinguishes this case from all the other cases that have applied the CPA. Now, the second prong, the plaintiff's claims are solely based on the defendant's acts and furtherance of their First Amendment rights. There are really two ways of looking at this. First of all, you can just look at the plaintiff's complaint here. All of the allegations are based exclusively on the petitioning speech here. They all relate to the defendant's conduct in the course of reporting about and calling for reform of the government. Unlike all the other cases, there's no pre-existing relationship. There's no private dispute here. In Hammonds, you'll recall that's the wake-up-in-your-makeup case. That was a dispute between competitors. In Sandholm, there was a long-running battle between parents and the local coach. Duracraft, Hytel, they involved a relationship between an employee and his or her employer. The August case that just came down a week or so ago involved the defendant there was an attorney who had filed suit against the plaintiff in another matter. And then finally, we have the Meyer v. Levy case, another case actually cited by the plaintiff, which was another coach case. So there are no allegations in this complaint that the defendants perpetrated any acts outside the course of their petitioning speech. Now, there's another way of looking at this. And that is the court can look behind the allegations to see if these claims have any independent basis. And sometimes this is necessary, because here's the real challenge, I think, in dealing with the CPA. And that is, there's always a tort alleged, claimed, right? The challenge is that slapsuits don't announce themselves as slapsuits. They masquerade as legitimate torts. But fortunately, Sandholm, Duracraft, Hytel, they all say that a court can look behind the pleadings. It can look at affidavits submitted, both pro and con. It can look at the facts and circumstances behind the filing of the case. And this is consistent with the statute, because it allows a motion to dismiss, which has been interpreted as a 2619A9, bringing in affirmative matter. It allows a motion for summary judgment. And if the court engages in that kind of analysis here, it shows that the plaintiff's claim has all the hallmarks of a slapsuit. Excuse me, Mr. Vandell. Oh, go ahead. No, no, no, please. We now have Sandholm, which says that the genuine claim, genuine claim of defamation, as in this case, or may or may not be genuine, I don't know, but assuming it were, we now have a burden of proof change due to Sandholm. Where did your client meet its burden of proof before the trial court in this case? Our client met that burden of proof, Your Honor, in a couple ways. First of all, what Sandholm says is there has to be an independent basis, a genuine basis for making that claim. And that's what separates a slap versus a non-slapsuit. Here, if you look at his original complaint, which I think shows his true motivation in filing the complaint to begin with, there wasn't even an assertion that he didn't leave work early. The only assertion was that there was a misidentification of his car and his home. Same thing with the original complaint, or the amended complaint. The assertion there is that the defendant's statement that I left early on three occasions was false. Counsel, can I ask you, doesn't Sandholm say that the genuineness aspect of it tests the genuineness of defendant's acts, not the merits of the plaintiff's suit? Well, initially, the initial question that Sandholm teaches is there is an inquiry into whether or not the plaintiff has stated a meritless retaliatory suit. And here, the defendants offered into evidence, through affidavits, substantial evidence that showed, for example, in the month before the reports were broadcast, the plaintiff's courtroom was closed every day of the month by 2 or 2-15. What's more, we ordered transcripts from his preliminary hearing proceedings, which also showed that his proceedings concluded by 2-05 at the latest. That was uncontroverted. And we have a situation here where the plaintiff did not file a verified complaint, did not file a verified amended complaint, had the opportunity to come forward with an affidavit establishing that, in fact, he did not routinely leave before the 4 o'clock closing time. Counsel, what about the allegations of his photograph of his car in front of his house, which was not his car or his house? Well, as my co-counsel will tell you, the plaintiff was running for appellate court at that time and was driving an STS Cadillac. His neighbor had the same car with the same bumper sticker. Whatever the explanation, that was not true. That was not true, but that's a non-material mistake, Your Honor. The gist of the report, and if you look at paragraph 19 of his amended complaint, the gist of the report was some Cook County judges leave early. Not where he went after leaving early. It's that they leave early. And the uncontradicted evidence is that he leaves early. Is the purpose of SLAPP to allow expedited appeals of cases involving whether truth is a defense, which you're arguing now truth is a defense, will prevail? You might well prevail. What does that have to do with SLAPP? Why are you in front of us today? Because we are here involving a situation where the defendants exercise core First Amendment rights and face the suit, face the suit, before they even finish their reports, okay? It has all the hallmarks of a SLAPP. You said it several times now. So the hallmarks of a SLAPP. The reason behind SLAPP, if you read the legislative histories and the articles on it, is to prevent big guys like the condominium builders and building owners and corporations, frankly, to not crush little guys, individual citizens, from saying bad things about these big guys. And this is Fox News and the PGA against a guy, Jim Ryan. He happens to be a judge. So I would suggest I'm unaware of any other SLAPP cases where the big guys were saying the little guy is trying to crush us. He's a bully. How dare he attack poor Fox News? It goes back, I'd suggest, and can you think of any cases along those lines? You cited six cases when you first started. Are any of those where there's some huge corporation being beat up by some individual citizen? Actually, Your Honor, I'd like to take minor issue with what you said. And that is, while it's often said that the paradigmatic, the typical SLAPP suit involves, for example, a developer trying to crush the citizen, right? If you read Mr. Sobczak's article, which was cited by the Supreme Court, really, it usually has an issue that occurs in a local setting of importance to the local population, where the target is somebody who's speaking out on that issue, and usually the plaintiff is someone who's acting in his own economic interest. So it's not always just little guy versus big guy, right? No, Jim, it's just some little guys, like in Hammonds, where they're two bizarre groups fighting each other. Right, but here we have a government watchdog organization commenting on an elected official. All elected officials in this system, right? There's no question in it. It's a First Amendment case. of this type of suit, there's got to be a mechanism whereby the courts can evaluate whether this is a SLAPP. And if you look at the damages that Judge Ryan claimed, $7 million, before there was any supervisory action taken against him, when you look at when it was filed, the report said that we've interviewed Tim Evans, and he's poised to act, and then the very next day, the suit gets filed. Those are all classic hallmarks of a SLAPP suit. Counsel, let me ask you, I'm sorry. No, go ahead, Maureen. As a follow-up to Justice Quinn's question, in Sandholm, it clearly says the court is first to determine whether the suit is a type of suit that the Act was intended to address. Correct. Now, is that a step in the analysis? You were giving us your analysis of step one and step two, as far as what the movement has to do. Is that part of the analysis for the trial court as well? I believe it is, Your Honor. And where does that fit, looking at the CPA Act, pursuant to, you know, paragraphs 15 and 20C? Where does that fit in? Is that the first thing the trial court looks at? The first thing the trial court looks at, as stated in the Hammond's decision, is whether or not we're looking at the exercise of First Amendment rights. And I think there's no question about that. Okay, well, where does that determination of whether or not this is the type of suit fit in, or does it fit in, in the analysis? I'm sorry. Again, the Sandholm case, the Sandholm court says first determine whether the suit is the type that the Act intended to address. First address that. Right. Is that the first step of the analysis? Is that the same as what you're talking about? Yes, it is, Your Honor. And since the SLAPP Act itself is designed to foster free speech, petitioning speech, right of assembly, that's the threshold question. Is that the type of conduct that the defendants are engaging in? And I think there's no question that that's what's going on here. But didn't Sandholm restrict it to government action, though? I mean, didn't they say that it has to be involved in some kind of government action? So it's not just protection of First Amendment or whatever amendment rights. There's another component. Right. There has to be a call for, it's got to be directed towards favorable government change. So is that just a consideration? That's not part of the step in the analysis when the motion is made? No, I think that is a consideration when the motion is made. But that was never severely contested in this case, that there wasn't. And in fact, the trial court found that the defendant's conduct was genuinely aimed at bringing about governmental change. Okay. Counselors, well, I want you to continue with your analysis. You said the movement has the burden. What's the burden of proof there for the movement? There has to be some sort of analysis. I mean, Sandholm doesn't say, for example, it's not clear and convincing evidence like the plaintiff's burden is. Right. So if it's silent, it would probably be better. Be preponderance, I think. That's right. Okay. And I would just note again that even though the plaintiff submitted some affidavits on totally collateral issues, he never contested the fact that he routinely leaves early. It's not in his complaint. He doesn't deny that. I don't know how we get there. Looking at page 15 of your brief, and again, where you're quoting Sandholm. In Sandholm, it says, Plaintiffs who file slaps, quoting Sandholm, do not intend to win, but rather to chill a defendant's speech or protest activity. Jim Ryan's trying to prevent you from speaking. He's not actively trying to get $7 million from Fox News. That language goes to his motivation, does it not? It does, Your Honor. But here's the point, okay. If the plaintiff could just say, oh, my intentions are genuine, you would never have a slap suit. And after Sandholm, there are slap suits. I mean, Sandholm recognizes that there could be a slap suit. And let me give you an example. But here, let's go back. So again, I quote Sandholm, as you did. It's saying, look at the plaintiff's motivation. Is it to get money? And that's what I just read. That looks to me like they're saying, if you're really looking for money, that's a big problem for the defense. Further, plaintiffs force defendants, quoting, to expend funds on litigation costs and attorney's fees to defend against the plaintiff's meritless claims. And these courtroom bailiffs discourage the defendants from continuing their First Amendment because of the money they're spending. So in this case, are we to believe that Jim Ryan hired a neighborhood lawyer to sue Fox and BGA, so that Fox and BGA would have to spend so much money representing themselves against this neighborhood guy, that that will chill their speech? It's not only that they would spend money, but sure, that they would chill their speech. No one came out with, after the suit was filed, there was no further investigation. I mean, the fact that a lawsuit is filed has a chilling effect on further investigation, further discussion. If you look at the Hytel decision, let me direct the court to that. That says that you can infer retaliatory intent by, A, the lack of merit in the claims, B, when it was filed, the proximity of the suit to the conduct, the exercise of free speech. And does retaliatory intent trump the stuff I just asked you about that's quoted in Sanholm? Did he intend to win? By filing suit, did Ryan intend to get money out of it? Or was he trying to get you guys to lay off? I believe he was trying to get us to lay off. All right. Does that affect the question for the trial court, to figure out the motivation of the plaintiff in this case, Mr. Ryan? Well, first of all, the SLAPP statute is an evidentiary-type proceeding, and all of the hallmarks of a SLAPP statute were established in terms of the fact that the reports were substantially true. If I could direct your attention to the Myers v. Levy case, which plaintiff cited, that was a case where the defendant said, I have 100 signatures of parents who think that coach is inappropriate, right? And what the truth was that they only had 39. So the coach sued for defamation, and the appellate court said, even though we don't condone exaggeration and misrepresentation, the thrust of the claim was that coaches were unhappy, the parents were unhappy with the coach. And so the statements were substantially true. You have the same thing here, okay? Let's assume that he didn't leave early on one or two or three of the occasions depicted. If we adduce evidence that he left early every other occasion, then the reports are substantially true and it can't support a defamation claim. Counsel, can I ask you, are you equating meritless with failure to state a cause of action? You could have that situation where if a plaintiff brings a suit, and, for example, brings a wrongful termination suit, even though there's no employer-employee relationship from the face of the complaint, you can tick off that there's no merit to that. It must have been a file for other reasons. But didn't the Hammons case specifically reject that approach that Hytel took relative to meritless being failure to state a claim? Hammons is a little bit different, okay? It's one issue to evaluate the claim in the analysis of whether or not the claim has merit, okay? For example, if it's clearly barred by the statute of limitations. What the court in Hammons, I think, was addressing, we had argued in that case that because the suit could have been dismissed on 2-6-15 or 2-6-19, the court could affirm on that ground. But that's a big difference, 2-16 versus 2-19. Correct, but that's not what I'm saying. I'm saying that when a court conducts its analysis to determine whether or not the suit is meritless, right, it can look at the claims pled. Whether it's under a 2-6-15, i.e., it would never survive a motion to dismiss, or under 2-6-19 where the defendant has brought forth affirmative matter, it's still the same outcome. A court evaluates the merit of the claim. Okay, and the second step in the analysis under the Act is the movement has to show, and it's his burden or her burden to show, that the suit is meritless and retaliatory. Is that right? Or as put by the Sanhome Court, whether it's solely based on the petitioning activities. Right, I'm saying that equals, that's your burden to show that. Correct. Right, and you're arguing to us that you've met your burden in meritless by showing that he did fail you to state a cause of action? Right, that he couldn't be successful in any of these claims. Whether you look at it from the face of the complaint, i.e., he didn't really plead a defamation claim because whether it was his car or not is besides the point, or by looking at the evidence adduced by the defendants which established uncontrovertedly that he did leave early from his post and that, therefore, the reports are true. May I ask? As to this meritless of his claim, if you have Fox broadcasting stories that judges leave a courthouse midday, that one judge was followed and his car was parked outside his house midday, another judge was seen midday in the backyard of her backyard residence, and they also broadcast a statement by a PGA official saying judges should punch a time clock each day, doesn't all that at a minimum imply to the TV viewer that judges are engaged in wrongdoing? I don't believe so, Your Honor. I mean, these are elected officials. There's not even an implication of wrongdoing by the judge under those facts? The thrust of the report was the inefficient use of court. Could you answer my question directly? Yes. Isn't there at least an implication of wrongdoing conveyed to the average TV user? When you look at the thrust of the report, which is resources not utilized properly, courtrooms are empty and judges are not putting in a full day, it doesn't necessarily impugn the integrity of the judges, Your Honor. It impugns the integrity of the system. And to the extent someone could draw a negative inference from that, of course, in Illinois we have the innocent construction rule, and that report was good reporting about how some judges are just not fully utilized and that the system needs to be addressed. Counsel, I have to ask you about a statement you make in your joint opening brief on appeal. I believe it's your statement. You're talking about Judge Egan's order that's being appealed here. You state, The conclusion of the circuit court's order reveals the circuit court's declared rationale for its ruling, its hesitancy to impose the act's mandatory attorney fee clause. Do you truly believe that? Well, I think it's odd that at the end of his report that he says, Now's the time to do the right thing, and assessing attorney's fees against Judge Ryan would not be the right thing to do. But if that's odd, that's one thing. But you claim it's the rationale for that court's ruling. I don't know of any other way to interpret it. I mean, in defense of Judge Egan, he was writing his opinion before Sandholm came down, before Hammonds came down. Well, there was still the Wright case. I mean, there were other cases that he could rely on. Well, I can't understand why the assessment of attorney's fees, that issue would have any bearing on whether or not this is a SLAP or not. That would, if it were determined. But isn't that one of the purposes of the SLAP Act? I mean, when you look at the act itself, doesn't it list that to provide for attorney's fees? It does, Your Honor, but in denying the petition, it seemed like Judge Egan was relying that as a basis for denying the motion to dismiss under the anti-SLAP. And that would not be a relevant consideration. That may be the outcome of a determination that, yes, this is a SLAP, but I just don't see how the fact that, if it were a SLAP, it would result in a fee award, bears on the issue of whether it's a meritless retaliatory SLAP. Counsel, what's the third part of the – the first part is the movements burden, which, as you say, is by preponderance of the evidence. Then what's the third part of it? Well, let's assume the first two prongs are satisfied. Then the burden shifts to the plaintiff to show by clear and convincing evidence that the activities were not genuinely aimed at bringing about governmental change. The plaintiff offered no evidence on that score, and the trial court correctly found that they were genuinely aimed, as evidenced in the fact that activities were taken. If I could make one more observation on that point, and that is that the Act actually requires a court to look at each claim individually. It says the Act applies to any motion to dismiss of a claim in a judicial proceeding on the grounds that the claim is based on the exercise of First Amendment rights. And this makes sense, because let's say you have one meritorious claim and then five frivolous ones. It has the same chilling effect as if they were all frivolous, forcing the defendant to defend five frivolous suits, incurring the expense of that. He still would have the expense of representing them on one, so I don't know if it requires more work. I mentioned more lawyers' fees. Well, that was my point, Your Honor. If there's one meritorious claim and then there's five, ten unmeritorious ones, it only adds to the expense. I'm just saying what the statute says. Well, is non-movement supposed to show that it is a slap or isn't a slap? The non-movement's burden is to show the only way that the non-movement can avoid application of the slap statute is to show that the defendant's conduct is a sham, that they're not genuinely aimed, that it's calculated just to delay and frustrate the plaintiff. And again, there's no evidence of that here. So are you saying that there's the second step, it's the movement's responsibility to come forward with evidence relative to the meritorious and retaliatory and the non-movement's as well in the third part? No. The movement has the burden of establishing free speech calculated to bring about governmental change and that the plaintiff's claim is solely based on that free speech, right? Once the movement does that, then... But isn't the solely part, isn't that made up of the meritless and retaliatory aspect? Correct. Right. So you have to prove that as well as the movement. Correct. Correct. So then when we get to Part 3, does the non-movement have to prove the same thing? No, because Part 3, Prong 3, is based on the defendant's conduct. And the non-movement has to show that the defendant's conduct was all a sham. It really wasn't calculated or aimed to bring about governmental change. Thank you. Could you turn over some time to Ms. Bruno? She looks like she's anxious to get started. Thank you. Oh. Okay. Thank you. May it please the Court, John Pataplos again on behalf of Jim Ryan, who is the plaintiff's affiliate in this matter. I'd like to start out by citing the case of McDowell v. Smith. And it puts this type of defamation case in perspective. It states, An individual who maliciously, wantonly, and without probable cause, disburses the character of a public officer in a written or printed paper delivered to those who are invested with the power of removing him from office is responsible to the injured and damages. Although such paper is masked under this auspices to cover the investigating conduct of the officer for the general good, public policy demands no such sacrifice of the rights of the persons in official capacity, nor will the law endure such a mockery of justice. I start with that because the intent of the Citizen Participation Act is to prevent slap lawsuits. What we have before the justices today is a case of David v. Goliath. This is a case where a multibillion dollar multinational corporation has taken an attack on, albeit a judge of the circuit court of Cook County, he is David. There is nothing that Judge Ryan or myself can do to Fox News or the Better Government Association to slap him, to shut him up. Well, how about suing him for $35 million? Well, $35 million that if the jury comes back and awards that, Justice Quinn, then I'll be it. We requested $7 million in this case because we did a jury verdict. You have several counts, that's where I get that number. Correct. But they're all coming from the same set of facts. And as a plaintiff attorney, we all plead different counts in the beginning of a case. The Citizen Participation Act has a burden. I put forth to this court that the defendants have not met their burden. The defendants have not proved that this lawsuit is solely based on their First Amendment rights. And how do we show that? It's their burden to come across and state why this case is a slap suit and why it's solely based on their speech. They need to put forth those facts. They have not. The facts in this case are about false statements that were stated regarding Judge Jim Ryan, which occurred on May 24, 2010. It's a fact that FOX and the BJA did a joint investigation alleging that some judges were leaving their courtrooms early. It's a fact that the expose on May 24, 2010, alleged that Judge Ryan left early and portrayed his vehicle in a driveway of a home. It's a fact that it was not his vehicle. It was not his home. It's also a fact... Their motivation at the time was for the good of the order, wasn't it? Because we have a system where judges go home early. At least they're not at work. Many judges are not at work after 2 o'clock. Is that a bad thing for FOX and BJA to do? What a bad thing? Sorry, I didn't hear the question. The motivation of FOX. Are you questioning their motivation for this whole series of news stories? The motivation I'm questioning is the motivation they had for my client, Judge Jim Ryan. They portrayed a bunch of judges. Two other judges, Judge Severi, Judge Laboni. But this case is about Judge Jim Ryan. As for Judge Jim Ryan, they were wrong. As for Judge Jim Ryan, they caused harm to his reputation in his personal life and his professional life. Judge Ryan was assigned a mentor. Judge Ryan was put into a different role in the judiciary. And all because of the facts. His pay wasn't cut, was it? His pay was not cut. And he was working initially at 51st and Wentworth? That's correct. Counsel, let me ask you. As far as the analysis that we've already discussed with your opposing counsel, the first thing the movement has to show is that it, or he or she, engaged in protected activities. Is that right? Do you agree with that? That is correct. The second part is showing that the claim was solely based on that activity. Which includes showing that the suit was meritless and retaliatory. Do you agree with that as well? I do agree with that. Tell me how your opponent did or did not carry its burden showing that the suit was meritless and retaliatory. The defendants put forth, the BJA put forth the 2619 motion to dismiss pursuant to the Citizen Participation Act. Fox defendants put a stand-alone motion to dismiss. Under 2619, you have to take all well-pled facts as true. Under that analysis, all the facts that the plaintiff has pled are true and they must come forth with some type of evidence to show that this is retaliatory. They did not. They did not put any type of fact forward. I believe the analysis they would have to put facts forward that what we stated was true. They did not. All they said is this is First Amendment speech, therefore it's protected. And it's the plaintiff's contention that they have not met their burden and the burden has not shifted to the plaintiff. Even though the plaintiff put forth all the facts to show the trial court that this is not a slap suit and it has merit, the burden actually did not shift to us, but we took it upon ourselves to give the facts to show it's not a slap. Counsel, what about the fact that the request for damages is so high? Does that show it's retaliatory at all? Justice, that amount was from a jury verdict reporter from the case of Thomas v. Page, which is the Illinois Supreme Court Justice's verdict against a Kane County jury where Mr. Mandel was involved as well and that award was $7 million. So we didn't pull that award out of the air. That was an award that we actually looked at the jury verdicts within the state of Illinois for what a judge has been awarded in a defamation case. How about the immediacy of your claim? Justice, we filed that claim. Judge Ryan, as alleged in our complaint, contacted the producer, the reporters, on that date and time on May 24th and told them this information is incorrect. They continued to put teaser video on the TV showing him ducking out, here's another judge, and making comments, dirty little secret of the Cook County Justice. Mr. Placostain referred to playing hooky, cutting out early. Either this is a full-time job or not. Accusing the judges of malfeasance. This had an immediate effect, not only on his job and role as a judicial officer, it affected his family. It affected his wife, his two twin daughters. This is not something that someone walks home and turns on the TV. This is television. All his daughter's friends were coming to him. Your daddy's in trouble. His wife was causing him problems. He was having problems dealing with his bosses. The Supreme Court was brought in on it. This is something that couldn't wait. He told them this is false. He told them this is wrong. He gave them the evidence that on the date they claimed, the first date that he left early, he was signing a search warrant at 51st and Wentworth at 2.30, which clearly shows he was not at home. On the second date, Fox and the BJA stated that he left early and they filed him to leave early. He wasn't even in the courthouse. The records show that there was a different judge doing his call. If they would have done a Freedom of Information, they would have saw he was at a funeral for his wife's uncle. This is information showing... It still means he left early. You mean he went to a ball game or a funeral? They said they followed him to leave early. He was never in the courthouse. So if they followed him, they would have known that he was not in the courthouse on that date. So the events that they reported or broadcast to viewers, in your opinion, did that supply sufficient... On their behalf, did they imply that this judge was involved in wrongdoing? Yes. Is that defamatory? Yes. Does that make your claim genuine? Yes. Counsel, let me ask you about your opponent's... You have four claims, do you not? Yes. For defamation per se, intentional infliction, emotional distress, intrusion into seclusion, and false light, is that right? That is correct. Now, your opponent claims that you failed to state a cause of action for those using kind of a 2615 analysis. If not, a pleading survives a 2615 doesn't mean it's a slap suit. Just because someone files a claim doesn't mean he's doing it to harass or retaliate. The 2615 motions are actually still pending in the trial court and haven't been ruled upon. We do know that Judge Egan in the trial court under the CPA found that in his language that the claim had merit and that there was falsehood said about Judge Ryan. And that was on a single count complaint. Counsel, do you think Judge Egan's rationale was to hesitate to impose the mandatory fee clause? No, absolutely not. I think what Judge Egan was saying there that to not look at the facts of a case and impose attorney's fees is wrong. Because defense counsel wanted them to look at, well, this is a slap suit, it's dealing with First Amendment, dealing with government action, game over, impose fees. Which I believe Judge Egan was doing in that scenario was he looked at the case of Wright from the Illinois Supreme Court and saw that they looked at the facts of the case and he followed Wright, issued the facts, looked at the facts, issued his opinion denying the CPA and what he was stating is to just give attorney's fees without looking at the facts of the case and not look at the facts of the case. So you agree with that? I do not, Your Honor. You cited, as soon as you stood up, you cited a case, McDonald. Yes. Was it cited in your brief? And if not, can I have the cite? It is, I believe it's cited in the brief, Judge, but it is Supreme Court of the United States number 84-476 decided June 19, 1985. And the name is McDonald? McDonald v. Smith. Okay, and there should be like a U.S. Law Weekly, or rather a LED Second, or? It is 737 F. Second 427. Okay, well, if it's F. Second, it'll be just about, okay. Both sides cite the New York versus, New York Times versus Sullivan to eventually prevail in this case. Won't Mr. Ryan have to show that there was actual malice on the part of Fox and BGA? Yes. But that's not part of the... Or failure to adequately investigate. Correct. There are a myriad of defenses yet, but those aren't before us. Those are not part of... No, they may be future defenses. They are not part of the Citizen Participation Act. Would you like to conclude? Yes, Your Honor. Thank you. We'd ask that this Court affirm the decision of the trial court denying the Citizen Participation Act. Thank you. Appellants. Ms. Bruno. Good afternoon. May it please the Court, I know we're a little off the time schedule here, but I certainly want to be able to answer some of the questions Your Honors have posed on behalf of the BGA. I think there's a number of issues that we'd like to speak to that Your Honors have raised in the course of the arguments. Okay, well give us the paperback version. I'll do my best. In five minutes. Okay. Thank you. First and foremost, Justice Quinn, you talked about whether a big media organization or a big organization should be protected by the CPA. I didn't ask that, but you can certainly take it that way on your side. Well, the first point is the CPA was passed in order to address SLAPs, commonly known as strategic lawsuits against public participation. And the traditional SLAP was a big developer suing a citizen activist. But they've evolved over the course of time. And what the CPA is intending to do is protect more. It's intending to protect parties and organizations who seek to petition the government to obtain favorable action. And the conduct that's at issue here is without dispute brought by an organization, the BGA, whose mission is to work for the integrity, transparency, and accountability in government by exposing corruption and efficiency. That's their mission. That's what they're out in the public trying to do, trying to bring issues to the public, issues to the government to effectuate change. It's precisely the type of organization the CPA would seek to foster their participation in government. There's no question about that. The CPA is about more than David versus Goliath. Section 10 of the CPA specifically lists all the different type of organizations who are entitled to protection. And there's nothing that would exclude even a media organization such as WFLD. Judge Kennelly, when he analyzed the CPA and the SACAR opinion, addressed this very point. Another point I wanted to raise is the McDonald v. Smith decision cited by plaintiffs. That's a 1985 decision. And there's no doubt that the Illinois legislature was aware of that opinion, it's a U.S. Supreme Court case, when they passed the CPA. The CPA is intending to do something. It has an objective. It's intending to foster governmental speech, petitioning, and governmental action. And are there prices to be paid in the course of doing that? Absolutely. And the legislature recognized that. In the outset of the CPA, they set forth a public policy. And what they state is participation in government is supposed to be safeguarded with great diligence. Counsel, can I ask you, in Sandholm, the Supreme Court tells us, first determine whether the suit is the type of suit the Act intended to address. What does that mean for the trial court to do? Well, I think there's two elements there. You can look at the entire lawsuit and what the lawsuit is about, the context of the lawsuit, who the parties are involved in that lawsuit, when it was filed, and what is that lawsuit seeking. In this case, we're talking about a public official who has filed a lawsuit about the criticisms he received with respect to how the taxpayer's money is being used, about the inefficiencies. But is there any burden, extra burden put on one side or the other relative to that? Or is it what's provided for in the Act as far as the motion and how that proceeds? Well, I think Sandhome has construed the Act. The burden shifting analysis that is set forth in Sandhome is not explicitly written in the Act. I don't think there's any question about that. They've now interpreted what the Act is trying to do. And under Sandhome, we acknowledge that the defendant does have the initial burdens. The defendant has the initial burden of first demonstrating to the court this is petitioning activity under which the court or the  wants to protect. And then it remains the defendant's burden to make the initial showing that plaintiff's lawsuit is solely based on that petitioning activity. And as we've discussed, the ways that they can demonstrate that is by as I discussed looking at the context of the lawsuit but also looking at the claims that the lawsuit includes. In this case, there are four causes of action. And as we discussed at length in our papers, those four causes of  include the initial infliction of emotional distress, the false life, and the defamation per se. Each one of those claims should be looked at individually and analyzed. And as we submitted in our papers, plaintiff has not met his standards. And this is not government petitioning. This is not what the CPA was talking about. When the well, you wrote the decisions. And my understanding of that interpretation, your honor, is that we don't have to go through the entire analysis. You don't even get out of the box. This was not a government petitioning case. This is not what the CPA was intended to be talking about. The subsequent August decision does more. It goes in depth into the case. It was on summary judgment at that point. But the court did go through and look at all the allegations. What were the allegations stating? What kind of damages were truly suffered by the plaintiff in that case? In ours, we have boilerplate allegations about reputation being harmed. Boilerplate allegations that are capped with a $7 million damages request. As you said, it quadrupled. A lawsuit filed during the middle of the investigation. Seeking to stop that speech. That is what this lawsuit intended to do. Will Judge Ryan turn the money away if he's awarded it? I assume not. But that's not the purpose of his lawsuit. The purpose of his lawsuit is to stop the speech, stop the petitioning activity. He filed the lawsuit before any court. I also would like to speak to some of the statements as to the record. The motion to dismiss that was before the court was the motion to dismiss the amended complaint. That was brought by both the WFLD defendants and the BGA defendants. There were two separate motions before the court. But the BGA defendants motion was a 2619. And in the course of that briefing, the parties submitted to the court significant evidence, both plaintiffs and defendants. This is not a case where you need to look only at the allegations. There was a 619 motion where both parties had submitted multiple affidavits and those materials demonstrated that the statements that were contained in the broadcast were in fact substantially true. As to your questions about didn't this telecast discuss wrongdoing, it certainly wasn't a compliment to Judge Ryan. We  that wrongdoing is not sufficient to state a defamation per se claim. Wrongdoing is not enough. That is not a statement that he has conducted any kind of criminal activity or has acted improper or inappropriate in his judicial conduct while on the bench. Is it not enough to suggest that the court or the judge is doing something inappropriate? The judge couldn't be  lecture at a law school or giving a presentation somewhere on the law? Wouldn't that be inappropriate? It wouldn't, Your Honor, but the evidence in the record demonstrated that when the investigation was conducted in April 2010, the very month before the broadcast was on television, Judge Ryan did not stay in court past 2 10 on a single day. He wasn't in his courtroom. Was he out of the courtroom? Again, he could have been in chambers. Could he not? It is possible that may be the case. There was no evidence ever provided by plaintiff to that effect. Would you like to conclude? In conclusion, what I will state is as we have discussed, this lawsuit was brought by a public official who has been criticized about how he was performing his public duties. This was not a lawsuit that was brought because the BGA and WFLD provided some report on his personal life. This was a report on how he was conducting his public duties. This is precisely the type of conduct that the CPA has stated is of the utmost importance. It is the type of conduct that is to be safeguarded with great diligence. It is precisely this type of conduct that the CPA contemplated and sought to protect when it was passed. We believe that the trial is now closed. Any issues matter under advice. We're adjourned.